## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRUDY CLARK, DONNA NESMITH, JESSICA SMITH, and SHELLY STACK, Individually and as representatives of a class of similarly situated persons, on behalf of the BETH ISRAEL DEACONESS MEDICAL CENTER 401(K) SAVINGS AND INVESTMENT PLAN and the BETH ISRAEL DEACONESS MEDICAL CENTER VOLUNTARY 403(B) PLAN, | Case No: 1:22-cv-10068 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| BETH ISRAEL DEACONESS MEDICAL CENTER, THE BOARD OF DIRECTORS OF BETH ISRAEL DEACONESS MEDICAL CENTER, THE PENSION COMMITTEE OF BETH ISRAEL DEACONESS MEDICAL CENTER; and DOES No. 1-20, Whose Names Are Currently Unknown, | |
| Defendants. | |

## I.      INTRODUCTION

1.      Plaintiffs, Trudy Clark ("Clark"), Donna Nesmith ("Nesmith"), Jessica Smith ("Smith"), and Shelly Stack ("Stack"), individually and as participants of the Beth Israel Deaconess Medical Center 401(k) Savings and Investment Plan ("401(k) Plan") and/or the Beth Israel Deaconess Medical Center Voluntary 403(b) Plan ("403(b) Plan") (collectively, the "Plan"), bring this action under 29 U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated participants and beneficiaries of the Plan, against

Defendants, Beth Israel Deaconess Medical Center ("Beth Israel"), the Board of

Directors of Beth Israel Deaconess Medical Center ("Board"), the Pension Committee of

Beth Israel Deaconess Medical Center ("Administrative Committee" or "Committee"),

and Does No. 1-20, who are members of the Administrative Committee or the Board or

other fiduciaries of the Plan and whose names are currently unknown (collectively,

"Defendants"), for breach of their fiduciary duties under the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and related breaches of

applicable law beginning six years prior to the date this action is filed and continuing to

the date of judgment, or such earlier date that the Court determines is appropriate and

just ("Class Period").

2.      Defined contribution plans (*e.g.*, 401(k) and 403(b) plans) that are qualified

as tax-deferred vehicles have become the primary form of retirement saving in the

United States and, as a result, America's *de facto* retirement system.  Unlike traditional

defined benefit retirement plans, in which the employer typically promises a calculable

benefit and assumes the risk with respect to high fees or under-performance of pension

plan assets used to fund defined benefits, 401(k) and 403(b) plans operate in a manner

in which participants bear the risk of high fees and investment underperformance.

3.      The importance of defined contribution plans to the United States

retirement system has become pronounced as employer-provided defined benefit plans

have become increasingly rare as an offered and meaningful employee benefit.

4.      As of December 31, 2020, the 401(k) Plan had 12,785 participants with

account balances and assets totaling approximately $1.3 billion, placing it in the top

0.1% of all 401(k) plans by plan size.[1]  Defined contribution plans with substantial

assets, like the 401(k) Plan, have significant bargaining power and the ability to demand

low-cost administrative and investment management services within the marketplace

for administration of 401(k) plans and the investment of 401(k) assets.[2]  The

marketplace for defined contribution retirement plan services is well-established and

can be competitive when fiduciaries of defined contribution retirement plans act in an

informed and prudent fashion.

5.      Defendants maintain the Plan, and are responsible for selecting,

monitoring, and retaining the service provider(s) that provide investment,

recordkeeping, and other administrative services.  Defendants are fiduciaries under

ERISA, and, as such, owe a series of duties to the Plan and its participants and

beneficiaries, including obligations to act for the exclusive benefit of participants,

ensure that the investment options offered through the Plan are prudent and diverse,

and ensure that Plan expenses are fair and reasonable.

6.      Defendants have breached their fiduciary duties to the Plan.  As detailed

below, Defendants: (1) failed to fully disclose the expenses and risk of the Plan's

investment options to participants; (2) allowed unreasonable expenses to be charged to

---

[1]The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 (pub. July 2021).

[2]The 403(b) Plan is administered jointly with the 401(k) Plan. All decisions pertaining to Plan investments and recordkeeping and administrative fees, as well as all advice furnished by the Plan's investment advisor, Captrust Financial Advisors ("Captrust"), consider the 403(b) Plan and the 401(k) Plan to be effectively a single plan. Accordingly, the 403(b) Plan benefits from the same size-related advantages as the 401(k) Plan.

participants; and (3) selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time Defendants selected and retained the funds at issue and throughout the Class Period.

7.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409 and 502 of ERISA, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class ("Class") as the Court may deem appropriate and just under all of the circumstances.

8.      Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

     a.      A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

     b.      A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

     c.      Equitable, legal or remedial relief for all losses and/or compensatory damages;

     d.      Attorneys' fees, costs and other recoverable expenses of litigation; and

e.      Such other and additional legal or equitable relief that the Court

deems appropriate and just under all of the circumstances.

## II.      THE PARTIES

9.      Clark is a former employee of Beth Israel and former participant in the

Plan under 29 U.S.C. § 1002(7).  Clark is a resident of Stoughton, Massachusetts.  During

the Class Period, Clark maintained an investment through the Plan in the Fidelity

Diversified International Fund, the Vanguard Total International Stock Index Fund, the

Vanguard Small Cap Index Fund, the MassMutual Select Mid Cap Growth Fund, the

Fidelity Contrafund, the JP Morgan Value Advantage Fund, the Vanguard Institutional

Index Fund, the Neuberger Berman Sustainable Equity Fund, the Fidelity Managed

Income Program, the Fidelity Advisor Total Bond Fund, and the Vanguard Total Bond

Market Index Fund and was subject to the excessive recordkeeping and administrative

costs alleged below.

10.     Nesmith is a former employee of Beth Israel and former participant in the

Plan under 29 U.S.C. § 1002(7).  Nesmith is a resident of Malden, Massachusetts.

During the Class Period, Nesmith maintained an investment through the Plan in the

Fidelity Freedom 2035 Fund and was subject to the excessive recordkeeping and

administrative costs alleged below.

11.     Smith is a former employee of Beth Israel and former participant in the

Plan under 29 U.S.C. § 1002(7).  Smith is a resident of Boston, Massachusetts. During the

Class Period, Smith maintained an investment through the Plan in the Fidelity Freedom

2050 Fund and was subject to the excessive recordkeeping and administrative costs alleged below.

12.     Stack is an employee of Beth Israel and participant in the Plan under 29 U.S.C. § 1002(7).  Stack is a resident of Lancaster, New Hampshire. During the Class Period, Stack maintained an investment through the Plan in the Fidelity Diversified International Fund, the Vanguard Total International Stock Index Fund, the Vanguard Mid Cap Index Fund, the MFS Mid Cap Value Fund, the MassMutual Select Mid Cap Growth Fund, the Fidelity Contrafund, the Vanguard Institutional Index Fund, the Fidelity Managed Income Program, the Fidelity Advisor Total Bond Fund, and the Vanguard Total Bond Market Index Fund and was subject to the excessive recordkeeping and administrative costs alleged below.

13.     Beth Israel is a Massachusetts non-profit corporation headquartered in Boston, Massachusetts.  Beth Israel, one of the largest hospitals in New England, is a teaching hospital of Harvard Medical School.

14.     The Board appointed "authorized representatives" of Beth Israel, including the Administrative Committee, as plan fiduciaries.  Does No. 1-10 are members of the Board who were/are fiduciaries of the Plan under ERISA pursuant to 29 U.S.C. §§ 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Administrative Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

15.     The Administrative Committee is the Plan Administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee maintains its address at Beth Israel's corporate headquarters in Boston, Massachusetts.  The Administrative Committee and its members are appointed by Beth Israel or its delegate to administer the Plan on Beth Israel's behalf.

16.     Does No. 11-20 are the members of the Administrative Committee and, by virtue of their membership, fiduciaries of the Plan or otherwise are fiduciaries to the Plan.  Plaintiffs are currently unable to determine the membership of the Administrative Committee or the identity of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that the membership of the Administrative Committee and the identity of any other fiduciaries is not publicly available.  As such, these Defendants are named Does as placeholders.  Plaintiffs will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Administrative Committee, the members of the Board, and other responsible individuals as defendants as soon as their identities are discovered.

### III.     JURISDICTION AND VENUE

17.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interest ed parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

19.     Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Beth Israel's principal place of business is in this District and the Plan is administered from this judicial district.  Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

20.     Plaintiffs have standing to bring this action.  Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court.  In addition, although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

## IV.    FACTUAL ALLEGATIONS

### A.    Background and Plan Structure

21.     The Plan is comprised of participant-directed 401(k) and 403(b) plans, in which participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays Plan expenses from Plan assets, and the

majority of administrative expenses are paid by participants as a reduction of investment income. Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses. The available investment options for participants of the Plan include various mutual funds, a collective investment trust (for the 401(k) Plan), a TIAA Traditional Annuity, CREF variable annuities, and a self-directed brokerage account.

22.    Mutual funds are publicly-traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities. Mutual funds are registered with the U.S. Securities and Exchange Commission ("SEC") and are subject to SEC regulation, including the requirement to provide certain investment and financial disclosures and information in the form of a prospectus.

23.    Collective trusts are, in essence, mutual funds without the SEC regulation. Collective trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments. Collective trusts were first organized under state law in 1927 and were blamed for the market crash in 1929. As a result, collective trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds. Today, banks create collective trusts only for their trust clients and for employee benefit plans, like the Plan. The main advantage of opting for a collective trust, rather than a mutual fund, is the negotiability of the fees, so that larger retirement plans should be able to leverage their size for lower fees. While most types of defined contribution plans have access to collective trusts, 403(b) plans do not.

24.     The TIAA Traditional Annuity is a guaranteed fixed annuity contract available as an investment option to participants in the 403(b) Plan.  Unlike the TIAA Traditional Annuity, the CREF Variable Annuities do not provide guaranteed returns. The returns generated by the CREF Variable Annuities, which are offered only to participants in the 403(b) Plan, are entirely dependent on the investment performance of each account.

25.     During the Class Period, Plan assets were held in a trust by the Plan trustee, Fidelity Management Trust Company.  All investments and asset allocations are performed through this trust instrument.

**B.      The Defined Contribution Industry**

26.     Failures by ERISA fiduciaries to monitor fees and costs for reasonableness, such as those identified herein, have stark financial consequences for retirees.  Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.  Over time, even small differences in fees compound and can result in vast differences in the amount of a participant's savings available at retirement.  As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

27.     The impact of excessive fees on a plan's employees' and retirees' retirement assets is dramatic.  The U.S. Department of Labor ("DOL") has noted that a

1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[3]

28.     Plan participants typically have little appreciation of the fees being assessed to their accounts.  Indeed, according to a 2017 survey conducted by TD Ameritrade, only 27% of investors believed they knew how much they were paying in fees as participants in defined contribution plans, and 37% were unaware that they paid defined contribution fees at all.[4]  It is incumbent upon plan fiduciaries to act for the exclusive best interest of plan participants, protect their retirement dollars, and ensure that fees are and remain reasonable for the services provided and properly and fully disclosed. Unfortunately, fiduciaries of defined contribution retirement plans, including large retirement plans like the Plan, also often lack understanding of the fees being charged to the plans that they administer, manage and control.

## C.     Recordkeeping and Administrative Services

29.     Fiduciaries of virtually all large defined contribution plans, including the Plan, hire a single provider to provide the essential recordkeeping and administrative ("RK&A") services for the plan.  These services include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and

---

[3]*A Look at 401(k) Plan Fees*, UNITED STATES DEPT. OF LABOR at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/a-look-at-401k-plan-fees.pdf (last visited January 3, 2022).
[4]*See* https://s2.q4cdn.com/437609071/files/doc_news/research/2018/Investor-Sentiment-Infographic-401k-fees.pdf  (last visited January 3, 2022).

investment education and guidance, providing participant communications, and providing trust and custodial services.

30.     The term "recordkeeping" is a catchall term for the entire suite of recordkeeping and administrative services typically provided by a plan's service provider or "recordkeeper" – that is recordkeeping fees and RK&A fees are one and the same and the terms are used synonymously.

31.     Recordkeepers typically collect their fees in two forms, respectively referred to as "direct" compensation and "indirect" compensation.

32.     Direct compensation is paid directly from plan assets and reflected as a deduction in the value of participant accounts.

33.     Indirect Compensation is paid to the recordkeeper indirectly by third parties and is not transparent to retirement plan participants.  In other words, the fees are taken from the investment options prior to the value of the investment option being provided to the participant.  Thus, in most cases, participants are not aware that they are paying these fees.  Most indirect compensation is typically collected by recordkeepers through asset-based "revenue sharing."

34.     Virtually all recordkeepers are subsidiaries or affiliates of financial services and insurance companies that also provide investment options to defined contribution plans, *e.g.*, mutual funds, insurance products, collective trusts, separate accounts, *etc.*, or have some other ancillary line of business (*e.g.*, consulting) to sell to plans.  As a result, all recordkeepers consider the economic benefit of their entire relationship with a defined contribution plan when setting fees for the RK&A services.

Simply put, discounts in the RK&A fee rate are often available based on revenues the recordkeeper earns through the provision of other services (*e.g.*, investment management revenues). In many cases, the additional investment management revenues are more than double or triple the revenue earned by the recordkeeper for providing RK&A services.

35.     There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" arrangement for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

    i.      Recordkeeping;

    ii.     Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

    iii.    Administrative services related to converting a plan from one recordkeeper to another;

    iv.    Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

    v.     Maintenance of an employer stock fund (if needed);

vi.      Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

vii.      Plan consulting services, including assistance in selecting the investment lineup offered to participants;

viii.      Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[5] (excluding the separate fee charged by an independent third-party auditor);

ix.      Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan complies with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

x.      Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

36.     This suite of essential RK&A services can be referred to as "Bundled RK&A" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  Anyone who has passing familiarity with recordkeepers' responses to requests for proposals, their bids and their contracts understands and appreciates that the services chosen by a

---

[5]The Form 5500 is the annual report that defined contribution plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

large plan do not affect the amount charged by recordkeepers for such basic and fungible services and any claim by Defendants that recordkeeping expenses depend upon the service level provided to a plan with respect to the above services is both false and frivolous.  Nonetheless, as is all too often the case, fiduciary-defendants often disingenuously assert that the cost of Bundled RK&A services depend upon service level (even though such an assertion is plainly untrue based upon the actual marketplace for such services), as part of attempt to perpetuate misunderstanding by the less informed in order to stave off breach of fiduciary duty claims.

37.    The second type of essential RK&A services, hereafter referred to as "A La Carte RK&A" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants.  These fees are distinct from the Bundled RK&A arrangement to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte RK&A services typically include, but are not limited to, the following:

      i.      Loan processing;

     ii.      Brokerage services/account maintenance (if offered by the plan);

    iii.      Distribution services; and

    iv.      Processing of qualified domestic relations orders.

38.    All national recordkeepers have the capability to provide all of the aforementioned RK&A services to all large defined contribution plans, including those much smaller than the Plan.

39.     For large plans with greater than 5,000 participants, any minor variations in the way that these essential RK&A services are delivered have no material impact on the fees charged by recordkeepers to deliver the services. That fact is confirmed by the practice of all recordkeepers quoting fees for the Bundled RK&A services on a per-participant basis without regard for any individual differences in services requested—which are treated by recordkeepers as immaterial because they are, in fact, inconsequential to recordkeepers from a cost perspective.

40.     While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, they all actually offer the same bundles and combinations of services as their competitors. Accordingly, the market for defined contribution plan RK&A services has become increasingly price competitive, particularly for larger plans that, like the Plan, have a considerable number of participants and significant assets.

41.     The marginal cost of adding an additional participant to a recordkeeping platform is relatively low.  These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan.  As a plan's participant count increases, the recordkeeper's fixed costs of providing RK&A services are spread over a larger population, thereby reducing the average unit cost of delivering services on a per-participant basis.

42.     Due to these economies of scale that are part of a recordkeeping relationship, and because the incremental variable costs for providing RK&A are dependent on the number of participants with account balances in a defined

contribution plan, the cost to the recordkeeper on a per-participant basis declines as the number of plan participants increases and, as a result, a recordkeeper is willing to accept a lower fee to provide RK&A as the number of participants in the plan increases.

43.     As a result, it is axiomatic in the retirement plan services industry that, all else being equal: (1) a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis; and (2) that as participant counts increase, the effective per-participant RK&A fee should decrease, assuming the same services are provided.

44.     Similarly, the average cost to a recordkeeper of providing services to a participant does not hinge on that participant's account balance.  In other words, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $10,000 as it does to provide services to a participant with a balance of $1,000,000.

45.     Informed, prudent plan fiduciaries are aware of these cost structure dynamics.  Understanding these marketplace realities and facts, prudent fiduciaries of large plans (like the Plan) will leverage the plan's participant count to obtain lower effective per-participant fees.

46.     Because recordkeeping fees are actually paid in dollars, prudent fiduciaries evaluate the fees for RK&A services on a dollar-per-participant basis.  This is the current standard of care for ERISA fiduciaries and has been throughout the Class Period.

-17-

47.     Prudent fiduciaries will regularly ensure that a plan is paying fees commensurate with its size in the marketplace by soliciting competitive bids from recordkeepers other than the plan's current provider.  Recognizing that RK&A services are essentially uniform in nature, and that small differences in the services required by a large plan are immaterial to the cost of providing such services, most recordkeepers only require a plan's participant count and asset level in order to provide a fee quote. These quotes are typically provided on a per-participant basis, enabling fiduciaries to easily compare quotes on an apples-to-apples basis to determine if the current level of fees being charged by a plan's recordkeeper is reasonable.

48.     Once a prudent fiduciary has received quotes, if necessary, the fiduciary can then negotiate with the plan's current provider for a lower fee or move to a new provider to provide the same (or better) services for a competitive (or lower) reasonable fee.  This is because prudent fiduciaries understand that excessive fees significantly and detrimentally impact the value of participants' retirement accounts.

49.     After negotiating the fee to be paid to the recordkeeper and electing to have the plan (*i.e.*, participants) pay that fee, the fiduciaries can allocate the negotiated fees among participant accounts at the negotiated per-participant rate or *pro rata* based on participant account balances, among other less common ways.

D.     **Defendants' Breaches of Fiduciary Duties**

50.     As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan in several significant ways.

Plaintiffs did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before this Complaint was filed.

### 1.  The Plan's Excessive Recordkeeping/Administrative Costs

51.     An obvious indicator of Defendants' breaches of their fiduciary duties is the Plan's excessive RK&A costs.  The impact of such high fees on participant balances is aggravated by the effect of compounding, to the significant detriment of participants over time. This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



52.     During the Class Period, participants paid Fidelity for RK&A services indirectly through asset-based revenue sharing.  The RK&A services provided to the Plan are and were the same standard services identified above, and those provided to comparable plans.  There are no services provided to the Plan and its participants by Fidelity that are unusual or out of the ordinary.  Regardless, for large plans, like the

Plan here, any differences in services are immaterial to pricing considerations, the primary drivers of which are the number of participants and whether the plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required by the plan.

53.     Since the start of the Class Period, Defendants allowed the Plan to be charged total amounts of RK&A fees that far exceeded the reasonable market rate.  The table below sets forth a conservative[6] calculation of the annual amount per participant the Plan ultimately paid to Fidelity in RK&A fees, per the Plan's Form 5500s and letter amendments to the Service Agreements ("Letter Amendments") that Beth Israel entered into with Fidelity Investments Institutional Operations Company, Inc. ("FIIOC").[7]

| | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|
| 401(k) Participant Accounts with a Balance | 10,753 | 11,295 | 11,833 | 12,312 | 12,785 | 11,796 |
| 403(b) Participant Accounts with a Balance | 3,450 | 3,346 | 3,484 | 3,374 | 3,483 | 3,427 |
| Total Plan Participant Accounts with a Balance | 14,203 | 14,641 | 15,317 | 15,686 | 16,268 | 15,223 |
| 401(k) Direct Compensation | | | | | $ 149,382 | |
| 403(b) Direct Compensation | | | | | $ 39,425 | |
| 401(k) Indirect Compensation | $1,017,453 | $1,316,696 | $1,122,774 | $1,390,724 | $ 1,657,044 | |
| 403(b) Indirect Compensation | $ 213,528 | $ 268,534 | $ 236,031 | $ 288,607 | $ 330,369 | |
| Total Administrative Credit to Plan | $ (640,000) | $ (535,000) | $ (562,500) | $ (750,000) | $ (795,000) | |
| Total Fidelity RK&A Fee ($) | $ 590,981 | $1,050,230 | $ 796,305 | $ 929,331 | $ 1,381,220 | $ 949,613 |
| Total Fidelity RK&A Fee ($/pp) | $42 | $72 | $52 | $59 | $85 | $62 |

[6]Revenue sharing formulas are not provided for all non-Fidelity mutual funds in the Plan lineup. To be conservative, Plaintiff has assumed these funds generate zero revenue sharing. If any of these funds do generate revenue sharing, the total RK&A fee will be higher than that reflected in the table.

[7]Plaintiffs calculate the total amount remitted to Fidelity as the sum of the revenue sharing amounts generated by the Plan's investments and any direct compensation listed in the Form 5500 less the excess revenue sharing credited back to the Plan per the Letter Amendments.

54.     Given the Plan's size, expected growth, and resulting negotiating power, with prudent management and administration, the Plan should unquestionably have been able to obtain reasonable rates for RK&A services that were significantly lower than the effective per-participant RK&A rates set forth above.

55.     According to publicly available data and information from the Form 5500 filings of similarly sized defined contribution plans during the Class Period, other comparable plans were paying much lower fees than the Plan throughout the Class Period.  That is clear and compelling evidence that the reasonable market rate is lower than what the Plan was paying since these comparable plans were able to negotiate lower fees for materially identical services.

56.     The table below lists the RK&A fees paid by similarly sized defined contribution plans, which represent the prices available to the Plan during the Class Period.[8]  Some of these plans used Fidelity as their recordkeeper, while others used different high-quality, national recordkeepers.  The table also indicates the number of participants and assets of each plan.

---

[8]As discussed above, the 401(k) Plan and 403(b) Plan are jointly administered, and accordingly are priced by Fidelity (and any other recordkeeper) as a single plan. The Letter Amendments, which allocate a single revenue credit from Fidelity pro rata among the 401(k) Plan and 403(b) Plan, confirm this arrangement.

| Plan | Participants | RK&A Fee ($) | RK&A Fee ($/pp) | Recordkeeper |
|---|---|---|---|---|
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement Fund | 10,455 | $ 449,739 | $43 | Vanguard |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 11,388 | $ 473,410 | $42 | Vanguard |
| PG&E Corporation Retirement Savings Plan | 12,273 | $ 350,111 | $29 | Fidelity |
| Viacom 401(k) Plan | 12,884 | $ 411,959 | $32 | Great West |
| **Beth Israel Deaconess Medical Center 401(k) and 403(b) Plan Average** | **15,223** | **$ 949,613** | **$62** | **Fidelity** |
| Michelin 401(k) Savings Plan | 15,880 | $ 543,332 | $34 | Vanguard |
| Ecolab Savings Plan and ESOP | 17,886 | $ 608,061 | $34 | Fidelity |
| Fedex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 19,354 | $ 444,784 | $23 | Vanguard |
| Qualcomm Incorporated Employee Savings and Retirement Plan | 20,955 | $ 639,143 | $31 | Fidelity |

57.     The RK&A fees calculated[9] for each similar comparable plan in the table above include all the direct compensation paid to the recordkeeper disclosed on each plan's Form 5500, as well as all indirect compensation.  Specifically, if the plan's pricing structure as described in each plan's Form 5500 reveals that some or all of the revenue sharing is not returned to the plan, then the appropriate amount of revenue sharing is also included to calculate the RK&A fees.  In some cases, the plan's investment options do not contain revenue sharing and, as a result, any indirect revenue is immaterial to the RK&A fees.  In other plans, all of the revenue sharing is returned to the plans and is therefore not included in the fee calculation.

58.     The comparable plans above received at least the same RK&A services received by the Plan for the fees paid.  In other words, the fees in the table above are

---

[9]Fee calculations for the comparable plans are based on the information disclosed in each plan's 2020 Form 5500, or the most recently filed Form 5500 if 2020 is not available.

apples-to-apples comparisons in that they include all the fees being charged by each recordkeeper to provide the same RK&A services to similar defined contribution plans.

59.     As the table above indicates, the fees paid by the Plan for virtually the same package of services are much higher than those of plans with comparable, and in many cases smaller, participant counts.  Indeed, based on fees paid by other large plans during the Class Period receiving materially identical RK&A services, it is clear and more than reasonable to infer that Defendants failed to follow a prudent process to ensure that the Plan was paying only reasonable fees.  In light of the amounts remitted to Fidelity throughout the Class Period, Defendants clearly engaged in virtually no examination, comparison, or benchmarking of the RK&A fees of the Plan to those of other similarly sized defined contribution plans, or were complicit in paying grossly excessive fees.

60.     Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RK&A services and their failure to take effective remedial actions amounts to a shocking breach of their fiduciary duties to the Plan.  To the extent Defendants had a process in place, it was imprudent and ineffective given the objectively unreasonable level of fees the Plan paid for RK&A services.  Had Defendants appropriately monitored the compensation paid to Fidelity and ensured that participants were only charged reasonable RK&A fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

### 2.     The Plan's Investment in the Fidelity Freedom Funds

61.     Among other investments, the Plan lineup offers a suite of fourteen target date funds ("TDF(s)").  A TDF is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.  TDFs offer investors dynamic, easy asset allocation, while providing both long-term growth and capital preservation.  All TDFs are inherently actively managed, because managers make changes to the allocations to stocks, bonds and cash over time.  These allocation shifts are referred to as a fund's glide path.  The underlying mutual funds that TDF managers choose to represent each asset class can be actively or passively managed.

62.     According to the Plan's Recordkeeping Agreement with FIIOC, the Plan has offered the Fidelity Freedom fund target date suite since July 2002.  Fidelity Management & Research Company (with FIIOC, "Fidelity") is the second largest TDF provider by total assets.  Among its several target date offerings, Fidelity offers the riskier and more costly Freedom funds (the "Active suite") and the substantially less costly and less risky Freedom Index funds (the "Index suite"), as well as a suite of collective investment trust TDFs[10] with certain structural advantages (described below). Defendants were responsible for crafting the Plan lineup and could have chosen any of the target date families offered by Fidelity, or those of any other target date provider. Defendants failed to compare the Active and Index suites, as well as all other available

---

[10]As noted above, collective investment trusts cannot be offered in 403(b) plans.

TDFs (including actively managed TDFs), and consider their respective merits and features.

63.     A simple weighing of the benefits of all other available TDFs at the beginning of the Class Period would have raised a significant red flag for prudent fiduciaries and indicated that the Active suite was not a suitable and prudent option for the Plan.  In addition, any objective evaluation of the Active suite would have resulted in an examination of and the selection of a more consistent and better performing and more appropriate TDF than the Active suite.  Had Defendants carried out their responsibilities in a single-minded manner with an eye focused solely on the interests of the participants, they would have come to this conclusion and acted upon it.  Instead, Defendants failed to act in the sole interest of Plan participants, and breached their fiduciary duty by imprudently selecting and retaining the Active suite.

64.     The two fund families (*i.e.*, the Active suite and the Index suite) have nearly identical names and share a management team.[11]  But while the Active suite invests predominantly in actively managed Fidelity mutual funds,[12] the Index suite places no assets under active management, electing instead to invest in Fidelity funds that simply track market indices.  The Active suite is also dramatically more expensive than the Index suite, and riskier in both its underlying holdings and its asset allocation

---

[11]Both target date suites have been managed by Brett Sumsion and Andrew Dierdorf since 2014.  Finola McGuire Foley was added to the Index suite team in 2018.
[12]Per Morningstar, the Active suite's underlying holdings are 88.8% actively managed, by asset weight.

strategy.  Defendants' decision to add the Active suite over another prudent TDF suite, and their failure to replace the Active suite at any point during the Class Period, constitutes a glaring breach of their fiduciary duties.[13]

65.     Exacerbating Defendants' imprudent choice to add and retain the Active suite is its role as the Plan's Qualified Default Investment Alternative ("QDIA").  Under DOL regulations, retirement plan fiduciaries can designate one of the investment offerings in a plan's lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA.  Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA.  The Fidelity Freedom fund with the target year closest to a participant's assumed retirement age (*i.e.*, age 65) serves as the QDIA in the Plan.

66.     Given that the vast majority of plan participants are not sophisticated investors, many of the Plan participants, by default, concentrate their retirement assets

---

[13]While the Active suite has enjoyed some positive recent returns, such performance does not absolve Defendants of their breaches throughout the Class Period.  Indeed, the managers of the Active suite made certain tactical shifts in the funds' asset allocation in or about 2020 that yielded positive returns in the high-volatility environment in 2020 and 2021, effectively undertaking a further strategy change and rendering the Active suite's recent performance less than meaningful in assessing the prudence of maintaining the Active suite in the Plan during the Class Period.  The fact that the changes in the Active suite produced more positive returns (as additional risk was undertaken) over a short period of time does not exonerate Defendants.  To hold otherwise would require a hindsight analysis not permitted under controlling precedent.

in TDFs.  As such, the impact of Defendants' imprudent selection of TDFs is magnified

vis-à-vis other asset categories.  Indeed, by December 31, 2020, approximately 38% of

the 401(k) Plan's assets were invested in the Active suite, while approximately 26% of

the 403(b) Plan's assets were invested in the Active Suite.

> i.    The Active Suite is High-Risk and Unsuitable for Plan
>       Participants

67.    The Active suite chases returns by taking levels of risk that render it

unsuitable for the average retirement investor, including participants in the Plan.  At

first glance, the equity glide paths of the Active suite and Index suite appear nearly

identical, which would suggest both target date options have a similar risk profile.

However, the Active suite subjects its assets to significantly more risk than the Index

suite, through multiple avenues.  At the underlying fund level, where the Index suite

invests only in index funds that track segments of the market, the Active suite primarily

features funds with a manager deciding which securities to buy and sell, and in what

quantities.

68.    The goal of an active manager is to beat a benchmark—usually a market

index or combination of indices—by taking on additional risk.  Market research has

indicated that investors should be very skeptical of an actively managed fund's ability

to consistently outperform its index, which is a significant concern for long-term

investors saving for retirement, like the Plan participants in this action.  Actively

managed funds tend to charge higher fees than index funds (which are passed on to the

target date fund investor through higher expense ratios).[14]  These extra costs present an

additional hurdle for active managers to clear in order to provide value and compensate

investors for the added risk resulting from their decision-making.  Indeed, Morningstar

has repeatedly concluded that "in general, actively managed funds have failed to

survive and beat their benchmarks, especially over longer time horizons."[15]  Although

they may experience success over shorter periods, active fund managers are rarely able

to time the market efficiently and frequently enough to outperform the market.  The

Active suite's allocation to primarily actively managed funds subjects investor dollars to

the decision-making skill and success, or lack thereof, of the underlying managers and

the concomitant risk associated with these investments.

69.     At all times across the glide path, the Active suite's top three domestic

equity positions were and are in Fidelity Series funds (funds created for exclusive use in

the Freedom funds), two of which have dramatically trailed their respective indices

over their entire respective lifetimes.  The Intrinsic Opportunities Fund, which is

currently allocated 7.97% of the total assets in the 2040-2065 Funds, has, over its

lifetime, missed its benchmark, the Russell 3000 Index, by an incredible 185 basis points

(1.85%) on an annualized basis.  The Large Cap Stock Fund, which is currently allocated

---

[14] After subtracting fees, returns from active management tend to be less than those
from passive management, as the latter costs less. Sharpe, William F., "The Arithmetic
of Active Management" Financial Analysts Journal, January/February 1991, Volume 47
Issue 1. "Properly measured, the average actively managed dollar must underperform
the average passively managed dollar, net of costs."
[15]"How Actively and Passively Managed Funds Performed: Year-End 2018";
https://www.morningstar.com/insights/2019/02/12/active-passive-funds.

6.95% of the total assets in the 2040-2065 Funds, has suffered even worse underperformance; its annualized lifetime returns trail that of its benchmark, the S&P 500 Index, by 276 basis points (2.76%). The portfolio of the Active suite is diversified among 32 underlying investment vehicles; the two aforementioned series funds represent approximately 15% of the 2040 through 2065 vintages, meaning for at least 20 years (because those target date funds have an associated target retirement date of at least twenty years from now), 15% of investor dollars are subject to the poor judgment exercised by just those two managers.

70.    Manager performance issues among the underlying investments in the Active suite are not limited to the largest positions. Of the 26 actively managed Fidelity Series Funds in the Active suite portfolio, half similarly trail their respective benchmarks over their respective lifetimes. Defendants never undertook a review of the performance of the funds comprising the Active suite portfolio during the Class Period.

71.    Moreover, as of the start of the Class Period, several of the underlying funds used within the Active suite portfolio lacked a sufficient performance history to enable fiduciaries to perform a meaningful analysis. No prudent fiduciary would have been able to properly evaluate these funds. Indeed, 14 out of 24 funds[16] failed to meet the basic criteria of at least a five-year performance track record. Accordingly, almost

---

[16]The two short-term debt funds, namely the Fidelity Institutional Money Market Fund and the Fidelity Short-Term Bond Fund, are excluded. History and outperformance are less relevant in this market segment given the limited scope for outperformance.

two-thirds of the funds used in the Active suite portfolio would have failed one of the most basic fiduciary requirements.  Defendants failed to undertake any such analysis at the start of, or at any subsequent point during, the Class Period.

| Underlying Fund Name | Ticker | Inception Date | Less than 5-Years Performance |
|---|---|---|---|
| Fidelity Series 100 Index | FOHIX | 20070329 | |
| Fidelity Series 1000 Value Index | FSIOX | 20130711 | x |
| Fidelity Series All-Sector Equity | FSAEX | 20081017 | |
| Fidelity Series Blue Chip Growth | FSBDX | 20130711 | x |
| Fidelity Series Commodity Strategy | FCSSX | 20090110 | |
| Fidelity Series Emerging Markets Debt | FEDCX | 20110317 | x |
| Fidelity Series Emerging Markets | FEMFX | 20080912 | |
| Fidelity Series Equity-Income | FRLLX | 20120612 | x |
| Fidelity Series Floating Rate Hi Inc | FFHCX | 20111020 | x |
| Fidelity Series Growth & Income | FTBTX | 20120612 | x |
| Fidelity Series Growth Company | FCGSX | 20130711 | x |
| Fidelity Series High Income | FSHNX | 20111003 | x |
| Fidelity Series Infl-Prtct Bd Idx | FSIPX | 20090929 | |
| Fidelity Series International Growth | FIGSX | 20090312 | |
| Fidelity Series International Sm Cap | FSTSX | 20090312 | |
| Fidelity Series International Value | FINVX | 20090312 | |
| Fidelity Series Intrinsic Opps | FDMLX | 20120612 | x |
| Fidelity Series Investment Grade Bond | FSIGX | 20080810 | |
| Fidelity Series Opportunistic Insights | FVWSX | 20120612 | x |
| Fidelity Series Real Estate Equity | FREDX | 20111020 | x |
| Fidelity Series Real Estate Income | FSREX | 20111020 | x |
| Fidelity Series Small Cap Discovery | FJACX | 20130711 | x |
| Fidelity Series Small Cap Opps | FSOPX | 20070322 | |
| Fidelity Series Stk Selec Lg Cp Val | FBLEX | 20120612 | x |

72.     Of the remaining underlying funds with a sufficient track record, only two had outperformed their prospectus benchmark over the previous three- and five-year period as of the start of the Class Period.  Accordingly, 22 of the 24 funds comprising the Active suite portfolio at the start of the pertinent period would not have fulfilled the most basic fiduciary criteria. Clearly, Defendants neglected to undertake any such analysis.

73.     Compounding the level of risk inherent in the Active suite's underlying holdings is the suite's managers' approach to portfolio construction and asset allocation decisions. Returning to the equity glide paths discussed above, the Active and Index suites appear to follow essentially the same strategy.  The chart below shows the percentage of assets devoted to equities in each vintage.

| Equity Glide Path | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Years to Target Retirement Year | | | | | | | | | | | | |
| Series | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 | 0 | -5 | -10 | -15 | -20 |
| Fidelity Freedom | 90 | 90 | 90 | 90 | 89 | 78 | 65 | 58 | 53 | 43 | 35 | 24 | 24 |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 80 | 65 | 59 | 52 | 43 | 34 | 24 | 24 |

74.     This chart only considers the mix of the portfolio at the level of stocks, bonds and cash.  A deeper examination of the sub-asset classes of the Active suite's portfolio, however, exposes the significant risks its managers take to boost returns. Across the glide path, the Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite.  The Active suite also has higher exposure to classes like emerging markets and high yield bonds.  Defendants failed to investigate the level of risk inherent in the Active suite portfolio and did not determine whether the risk level was suitable for Plan participants at any point during the Class Period.

75.     Since the Active suite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by 10 percentage points in either direction.  In a departure from the accepted wisdom that target date funds should maintain pre-set allocations, Fidelity encouraged its portfolio managers to attempt to time market shifts in order to locate underpriced securities,

which the firm dubs "active asset allocation."  This strategy heaps further unnecessary risk on investors, such as Plan participants, in the Active suite.  A March 2018 Reuters special report on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk."[17]  The report quotes a member of Longfellow Advisors, who told Reuters that, after the 2014 changes, "it was not clear to us that [the managers of the Active suite] knew what they were doing."[18] While many TDF managers are increasing exposure to riskier investments in an effort to augment performance by taking on additional risk, the president of research firm, Target Date Solutions, states that the Active suite has gone further down this path than its peers.[19]  Morningstar has noted in the past that active management has hindered the Active suite's performance, criticizing a previous poor decision to heavily weight to commodities.  Other industry experts have criticized the "chaotic glide paths" of the Active suite relative to peer target date providers.[20]  Morningstar similarly characterized Fidelity's shifts in the allocation of stocks between 1996 and 2010 as "shocking" and "seemingly chaotic."  Yet, since 2014, a fund family with a history of poor decisions has been given "carte blanche" to take further risks, to the severe

---

[17]"Special Report: Fidelity puts 6 million savers on risky path to retirement", https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI.
[18]*Id.*
[19]*Id.*
[20]Idzorek, T., J. Stempien, and N. Voris, 2011, Bait and Switch: Glide Path Instability, Ibbotson Associates.

detriment of the Plan and its participants.  Defendants never initiated or undertook any review or scrutiny of the Active suite's strategy changes.

76.     This desire and latitude to assume more risk exposes investors in what Fidelity brands "a lifetime savings solution" to significant losses in the event of volatility similar to the downturn experienced during the onset of the COVID-19 epidemic.  Morningstar analyst Jeff Holt opines that the popularity of target date funds derives from investors' belief that the funds are designed to "not lose money."  As a result, the average unsophisticated investor, such as the typical participant in the Plan, tends to gravitate toward the all-in-one savings solution a target date fund offers. Given this reality, Plan participants should be shielded from the riskiest fund families where active manager decisions could amplify losses in periods of market decline.

ii.     The Active Suite's Considerable Cost

77.     Even a minor increase in a fund's expense ratio (the total annual cost to an investor, expressed as a percentage of assets) can considerably reduce long-term retirement savings.  The fees charged by the Active suite are many multiples higher than the Index suite's industry-leading low costs.  While the Institutional Premium share class for each target year of the Index suite charges a mere 8 basis points (0.08%), the K share class of the Active suite—which the Plan offers—has expense ratios ranging from 42 basis points (0.42%) to 65 basis points (0.65%).

| Cost Comparison | | | | | | |
|---|---|---|---|---|---|---|
| Freedom Suite | Ticker | Exp Rat | Freedom Index Suite | Ticker | Exp Rat | Difference |
| Income K | FNSHX | 0.42% | Income Inst Prem | FFGZX | 0.08% | -0.34% |
| 2005 K | FSNJX | 0.42% | 2005 Inst Prem | FFGFX | 0.08% | -0.34% |
| 2010 K | FSNKX | 0.46% | 2010 Inst Prem | FFWTX | 0.08% | -0.38% |
| 2015 K | FSNLX | 0.49% | 2015 Inst Prem | FIWFX | 0.08% | -0.41% |
| 2020 K | FSNOX | 0.53% | 2020 Inst Prem | FIWTX | 0.08% | -0.45% |
| 2025 K | FSNPX | 0.56% | 2025 Inst Prem | FFEDX | 0.08% | -0.48% |
| 2030 K | FSNQX | 0.60% | 2030 Inst Prem | FFEGX | 0.08% | -0.52% |
| 2035 K | FSNUX | 0.63% | 2035 Inst Prem | FFEZX | 0.08% | -0.55% |
| 2040 K | FSNVX | 0.65% | 2040 Inst Prem | FFIZX | 0.08% | -0.57% |
| 2045 K | FSNZX | 0.65% | 2045 Inst Prem | FFOLX | 0.08% | -0.57% |
| 2050 K | FNSBX | 0.65% | 2050 Inst Prem | FFOPX | 0.08% | -0.57% |
| 2055 K | FNSDX | 0.65% | 2055 Inst Prem | FFLDX | 0.08% | -0.57% |
| 2060 K | FNSFX | 0.65% | 2060 Inst Prem | FFLEX | 0.08% | -0.57% |
| 2065 K | FFSDX | 0.65% | 2065 Inst Prem | FFIKX | 0.08% | -0.57% |

78.     Higher fees significantly reduce retirement account balances over time. Considering just the gap in expense ratios from the Plan's investment in the Active suite to the Institutional Premium share class of the Index suite, in 2020 alone, the Plan could have saved approximately $2.97 million in costs.  This tremendous cost difference goes straight into Fidelity's pockets and is paid for by Plan participants.  As the costs for recordkeeping services have dropped precipitously over the past decade,[21] recordkeepers like Fidelity have been forced to chase profits elsewhere.  The management fees derived from a plan's use of a provider's investment offerings substantially trump any compensation for recordkeeping services.  Thus, Fidelity is heavily incentivized to promote its own investment products, specifically those that

---

[21]"NEPC: Corporate Defined Contribution Plans Report Flat Fees," https://www.nepc.com/press/nepc-corporate-defined-contribution-plans-report-flat-fees.

charge the highest fees, to each plan for which it performs recordkeeping, including the Plan.

### iii.    Investors Have Lost Faith in the Active Suite

79.    The flow of funds to, or from, target date families constitutes one indicator of the preferences of investors at large.  According to Morningstar's report on the 2019 Target Date Fund Landscape,[22] investor demand for low-cost target date options has skyrocketed in recent years.  Following suit, the Index suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone.  At the same time, investor confidence in the Active suite has deteriorated; 2018 saw the series experience an estimated $5.4 billion in net outflows.  The movement of funds out of the Active suite has been substantial for years; the Reuters Report notes that nearly $16 billion has been withdrawn from the fund family over the prior four years. Defendants' conduct, in offering and maintaining the Active suite in the Plan, evidences their failure to acknowledge, or act upon, investors' crumbling confidence in the Active suite, while ignoring the simultaneous and justified surge in faith in the Index suite.

### iv.    The Active Suite's Inferior Returns

80.    Exacerbating, and indeed the most significant of, the myriad issues identified above was the Active suite's miserable performance when measured against any of the other most widely utilized TDF offerings.  Throughout the Class Period,

---

[22]"2019 Target-Date Fund Landscape: Simplifying the Complex."
https://go.morningstar.com/2019targetdate?utm_source=on24&utm_medium=referral&utm_campaign=2019_td_landscape_webinar

there were many TDFs that consistently outperformed the Active suite, providing investors with substantially more capital appreciation. It is apparent, given the continued presence of the Active suite in the Plan's investment menu, that Defendants never scrutinized the performance of the Active suite, prompted by the numerous red flags detailed above or otherwise, against any of the more appropriate alternatives in the TDF marketplace.

81.    A prudent fiduciary evaluates TDF returns not only against an appropriate index or a group of peers TDFs, but also against specific, readily investable alternatives to ensure that participants are benefitting from the current TDF offering. At the start of the Class Period, the Active suite ranked dead last when measured against the primary offerings of four of the five[23] largest non-Fidelity managers in the TDF marketplace. The below performance table, comparing the three- and five-year annualized returns of several representative vintages of the Active suite to those of the same iterations of the Vanguard Target Retirement Funds Investor Class, the T. Rowe Price Retirement Funds Investor Class, the American Funds Target Date Funds Class R6, and the J.P. Morgan SmartRetirement Funds Institutional Class, represents information available to Defendants at the start of the Class Period from the most recent quarter-end (the Fourth Quarter of 2015). Defendants could have sought this data from

---

[23]Along with Vanguard, Fidelity, T. Rowe Price, American Funds and J.P. Morgan, BlackRock is among the six largest TDF managers. BlackRock's only widely utilized TDF suite, the BlackRock LifePath Index Funds (the "LifePath Funds"), did not yet have a five-year performance history by the start of the Class Period, and accordingly, it is not included in the performance comparison tables in this Complaint.

the Captrust or Fidelity, or indeed obtained it themselves through just a few clicks of a computer mouse.

| Three-Year Annualized Return as of 4Q15 | | | | | |
|---|---|---|---|---|---|
| | Retirement | 2020 | 2030 | 2040 | 2050 |
| American Funds | 6.02% | 8.28% | 10.56% | 10.87% | 10.91% |
| T. Rowe Price | 5.26% | 7.52% | 9.28% | 10.23% | 10.23% |
| Vanguard | 3.71% | 7.21% | 8.52% | 9.46% | 9.47% |
| J.P. Morgan | 3.82% | 6.32% | 8.26% | 9.14% | 9.16% |
| **Fidelity Freedom** | **2.66%** | **5.96%** | **7.61%** | **8.50%** | **8.75%** |

| Five-Year Annualized Return as of 4Q15 | | | | | |
|---|---|---|---|---|---|
| | Retirement | 2020 | 2030 | 2040 | 2050 |
| American Funds | 6.43% | 7.72% | 9.10% | 9.22% | 9.25% |
| T. Rowe Price | 5.68% | 7.15% | 8.21% | 8.73% | 8.76% |
| Vanguard | 4.91% | 6.85% | 7.59% | 8.11% | 8.12% |
| J.P. Morgan | 4.47% | 6.38% | 7.32% | 7.85% | 7.87% |
| **Fidelity Freedom** | **3.27%** | **5.58%** | **6.49%** | **6.89%** | **6.92%** |

*Neither American Funds or T. Rowe Price offer a Retirement vintage. Accordingly, the 2010 vintage is used as a proxy for participants already in retirement.

82.     Across the board, at all stages along the Active suite's glide path from aggressive to conservative, the Active suite's returns paled in comparison to those of the above readily available alternatives.  Defendants, however, neglected to undertake any analysis of the Active suite against appropriate peers using the above or other important performance metrics.[24]  If Defendants had taken their fiduciary duties seriously during the Class Period, they would have replaced the Active suite with a

---

[24]Investment professionals and investment policy statements for virtually all competently managed defined contribution retirement plans appropriately recognize that the three-year and five-year annualized returns are the most important metrics for evaluating whether investment options should be maintained in a retirement plan lineup.  Three-year returns as of the Fourth Quarter of 2015 are not currently publicly available for each of the investable alternatives.  Such information was, however, easily accessible to Defendants at the time.

suitable alternative TDF.  Their failure to do so caused Plan participants to miss out on substantial investment returns for their retirement savings.

### 3.    The Plan's Objectively Imprudent Investment Options

83.    In addition to the Active suite, Defendants have saddled participants with additional objectively imprudent investment options.  It is a basic principle of investment theory that the risks associated with an investment must first be justified by its potential returns for that investment to be rational.  This principle applies even before considering the purpose of the investment and the needs of the investor, such as the retirement assets here.  The Capital Asset Pricing Model ("CAPM"), which is used for pricing securities and generating expected returns for assets given the risk of those assets and the cost of capital, provides a mathematical formula distilling this principle:

$ER_i = R_f + \beta_i(ER_m - R_f)$, where:

$ER_i$=expected return of investment
$R_f$=risk-free rate
$\beta_i$=beta of the investment
$(ER_m - R_f)$=market risk premium

Applied here and put simply, the $\beta_i$ is the risk associated with an actively-managed mutual fund or collective trust, which can only be justified if the $ER_i$ of the investment option is, at the very least, above that of its benchmark, $R_f$.[25]  Otherwise, the model

---

[25] In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.

collapses, and it would be imprudent to assume any risk without achieving associated return above the benchmark returns.

i.   The Neuberger Berman Socially Responsive Fund

84.    The Neuberger Berman Socially Responsive Fund Class R6 ("Neuberger Berman") was replaced in September 2019 as an investment in the Plan, but had been consistently and significantly underperforming its benchmark, the S&P 500 Index, for many consecutive years and on both a rolling five- and ten-year annualized basis, and should have been eliminated from the Plan's investment menu long before it was ultimately removed.  Defendants had access to the below returns data, as well as significantly more that is not currently publicly available, in real time during the Class Period:

**Annual Return v. Benchmark**

| Year | Performance, adjusted for investment expense | S&P 500 Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|------|-----------|-----------|-----------|
| 2014 | 10.77% | 13.69% | -2.92% |
| 2015 | -0.14% | 1.38% | -1.52% |
| 2016 | 10.38% | 11.96% | -1.58% |
| 2017 | 18.85% | 21.83% | -2.98% |
| 2018 | -5.56% | -4.38% | -1.18% |



**5-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | S&P 500 Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 4Q2014 | 15.20% | 15.45% | -0.25% |
| 4Q2015 | 10.53% | 12.57% | -2.04% |
| 4Q2016 | 13.40% | 14.66% | -1.26% |
| 4Q2017 | 14.97% | 15.79% | -0.82% |
| 4Q2018 | 6.51% | 8.49% | -1.98% |



**10-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | S&P 500 Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 4Q2014 | 7.94% | 7.67% | 0.27% |
| 4Q2015 | 7.14% | 7.1% | -0.17% |
| 4Q2016 | 6.75% | 6.95% | -0.20% |
| 4Q2017 | 7.83% | 8.50% | -0.67% |
| 4Q2018 | 12.61% | 13.12% | -0.51% |



85.     Defendants were far too late in eliminating this fund as an investment option.  As discussed above, active managers face an uphill battle to provide value by consistently beating their benchmarks with the additional obstacle of high fees, compared to those funds that simply track the benchmark.  Given the presence in the Plan lineup of an index fund that already tracked the Neuberger Berman fund's benchmark (the Vanguard Institutional Index Fund), there was no reason to include an actively managed fund in the US large cap space, particularly one so poor.  Indeed, Morningstar concluded in its year-end 2018 report on active vs. passive management that long term success rates (a fund's ability to survive and outperform a low-cost index fund tracking its benchmark over longer time horizons) were lowest among US large cap funds.  Defendants' misguided decision to retain the fund, an actively managed US large cap, was exacerbated by the fund's complete inability to provide participants with returns to justify its 59 basis points (0.59%) expense ratio.  Defendants' failure to

eliminate this underachieving investment option earlier than they ultimately did was a severe breach of fiduciary duty.

## V.   ERISA'S FIDUCIARY STANDARDS

86.   ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A)   for the exclusive purpose of
>
> > (i)    providing benefits to participants and their beneficiaries; and
> > (ii)   defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

87.   Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in a plan and their beneficiaries and defraying reasonable expenses of administering the plan.

88.   Under ERISA, parties that exercise any authority or control over plan assets, including the selection of plan investments and service providers, are fiduciaries and must act prudently and solely in the interest of participants in a plan.

89.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.  *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982).

90.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. Section 405(a) of ERISA, 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

91.     Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109.  Section 409(a) of ERISA provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties

imposed upon fiduciaries by this subchapter shall be
personally liable to make good to such plan any losses to the
plan resulting from each such breach, and to restore to such
plan any profits of such fiduciary which have been made
through use of assets of the plan by the fiduciary, and shall
be subject to such other equitable or remedial relief as the
court may deem appropriate, including removal of such
fiduciary.

## VI.   CLASS ALLEGATIONS

92.    This action is brought as a class action by Plaintiffs on behalf of

themselves and the following proposed Class:

> All participants and beneficiaries in the Beth Israel Deaconess
> Medical Center 401(k) Savings and Investment Plan and/or the
> Beth Israel Deaconess Medical Center Voluntary 403(b) Plan
> (collectively, the "Plan") at any time on or after January 12, 2016
> and continuing to the date of judgment, or such earlier date that the
> Court determines is appropriate and just (the "Class Period"),
> including any beneficiary of a deceased person who was a
> participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or

any other judicial officer having responsibility for this case who is a beneficiary.

93.    This action may be maintained as a class action pursuant to Rule 23 of the

Federal Rules of Civil Procedure.

94.    **Numerosity**.  Plaintiffs are informed and believe that there are at least

thousands of Class members throughout the United States.  As a result, the members of

the Class are so numerous that their individual joinder in this action is impracticable.

95.    **Commonality**.  There are numerous questions of fact and/or law that are

common to Plaintiffs and all the members of the Class, including, but not limited to the

following:

(a)     Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)     Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)     Whether and what form of relief should be afforded to Plaintiffs and the Class.

96.     **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.  In addition, Plaintiff seeks relief for the Plan under the same remedial theories that are applicable as to all other members of the Class.

97.     **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

98.     **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

99.    **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

100.    **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

101.    **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide

basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

102.    Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above. Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

103.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

104.    Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

**COUNT I**
**(For Breach of Fiduciary Duty)**

105.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

106.    Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the

exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan. In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

107.    To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

108.    As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

109.    Pursuant to Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and

any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

**COUNT II**
**(Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)**

110.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

111.     Beth Israel is responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee.

112.     In light of its appointment and supervisory authority, Beth Israel had a fiduciary responsibility to monitor the performance of the Committee and its members. In addition, Beth Israel, and the Administrative Committee had a fiduciary responsibility to monitor the performance of the members of the Committee.

113.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

114.     To the extent that fiduciary monitoring responsibilities of Beth Israel or the Committee was delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

115.     Beth Israel and the Committee breached their fiduciary monitoring duties

by, among other things:

> (a)   Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

> (b)   Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

> (c)   Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

116.     As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Beth Israel and the Committee discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

117.     Beth Israel and the Committee are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

118.    Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts constituted breaches; enabled the other Defendants to commit breaches by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

119.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

120.    In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

121.    To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of imprudent investment options and pay excessive recordkeeping and administrative fees, all of which was unjustifiable in light of the size and

characteristics of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demand judgment against Defendants for the following relief:

(a)     Declaratory and injunctive relief pursuant to Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of Section 502(h) of ERISA, 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

DATED: January 18, 2022

Respectfully submitted,

/s/John Roddy
John Roddy
Elizabeth Ryan
Bailey & Glasser LLP
176 Federal Street, 5th Floor
Boston, MA 02110
Telephone: (617) 439-6730
Facsimile: (617) 951-3954
Email: jroddy@baileyglasser.com
eryan@baileyglasser.com

James E. Miller
Laurie Rubinow
Miller Shah LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
lrubinow@millershah.com

James C. Shah
Alec J. Berin
Miller Shah LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
ajberin@millershah.com

Kolin C. Tang
Miller Shah LLP
19712 MacArthur Blvd.
Irvine, CA 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: kctang@millershah.com

Mark K. Gyandoh
Gabrielle Kelerchian
Capozzi Adler, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com
          gabriellek@capozziadler.com

Donald R. Reavey
Capozzi Adler, P.C.
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
Email: donr@capozziadler.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*